Statement of the Case.
NICHOLLS, C. J.
We copy herein the written judgment rendered in this case by the district court from which this appeal is taken, as it sets out fully the facts and the issues raised between the parties:
“The Morrison-Madison Company, Limited,, on August 2, 1900, purchased from Thomas-J. Henderson a certain sugar plantation known as the ‘Delogny,’ situated in the parish of St. James. The consideration was-$100,000, $20,000 of which was paid cash, and in representation of the balance of the purchase price the purchasers furnished one promissory note of $15,000, payable January 1, 1901, and five others, each for $13,000, payable annually thereafter, all secured by vendor’s lien and mortgage on said plantation.
“On the 6th day of January, 1902, Mrs. A. C. Shaffer, alleging herself to be the owner and holder in good faith and for valuable consideration of the first above described note of $15,000, and averring the nonpayment thereof, obtained from this court the issuance of executory process under which the Delogny plantation was seized and ordered to be sold in satisfaction of the payment of said note. Thereupon ensued the present suit. T. J, Henderson obtained a writ enjoining the foreclosure by Mrs. Shaffer on the grounds that the aforesaid note of $15,000 had been paid by the officers of the Morrison-Madison Company, Limited, and that the mortgage secur *484 ing the same had been extinguished; that the writ of seizure and sale in favor of Mrs. Shaffer had been illegally and wrongfully issued, and was absolutely null and void, being predicated upon a debt which had been paid and extinguished; and on the further grounds that no notice to pay issued, and that the writ ordered the property to be sold for cash, and not, as the law required, for cash to pay the matured installments of the debts, and on the terms of credit granted to debtor by the original act of sale and mortgage, and that the sheriff of this parish, in compliance with the terms of said writ, had advertised said property to be sold for cash, without regard to the fact that several of the notes representing said debt had not yet matured. Plaintiff finally prays that his writ of injunction be maintained and perpetuated, with costs, and that his right to claim damages be reserved. Defendant’s answer admits the sale to the Morrison-Madison Company, Limited; denies that the $15,000 note was ever paid by -the purchasers, but that the same was purchased by her, with her individual check, from plaintiff, before maturity, and in good faith. She further charges that, if plaintiff did not intend to sell said note, he was guilty of gross negligence in not informing her agent who negotiated the purchase thereof, and in surrendering the same uncaneeled.
“That she cannot legally or equitably be charged with the loss caused by plaintiff’s negligence, and that plaintiff is estopped by his acts from claiming against an innocent third holder for value that the same was paid when it left his possession. In the alternative she pleads that, if the court should hold there was no sale, the execution and delivery •of her check to Henderson was an error both •of fact and of law, that he received the same without consideration, that the consideration was null and void, and that she is entitled to reconvene and obtain the return of her $15,-000, with legal interest from date of payment.
“It appears from the evidence that the Morrison-Madison Company, Limited, was composed of three stockholders — Charles B. Morrison, Charles T. Madison, and Mrs. Amanda C. Shaffer, who is defendant in this suit; that this corporation was organized with a capital of $20,000 for the purpose of purchasing the Delogny plantation from Henderson, and to cultivate the same in sugar cane and other crops. The capital was contributed as follows: $100 by Mrs. Shaffer, $9,900 by Morrison, and $10,000 by Madison. That Morrison and Madison, not having means of their own, discounted their note with Mrs. Shaffer, in order to raise the $19,-900 of stock subscribed by them. That all three constituted a board of directors, of which Morrison was president and Madison secretary and treasurer. A resolution was then adopted by this board of directors empowering the president to purchase the Delogny plantation on the same terms under which the sale was eventually passed, except that the resolution provided that the $15,000 note (the subject of this suit) was to be paid out of the crops then on the place, the stipulation not being contained in the act of sale and mortgage. The crops growing on the plantation at the time of its sale were harvested by the purchaser, the Morrison-Madison Company, Limited, and shipped to Henderson. Morrison and Madison both testify that this was done simply as an act of courtesy to Henderson, but other parts of their testimony, taken in connection with that of Henderson, give me the contrary impression. Morrison says that he went'at one time previous to the taking up of the $15,000 note to Henderson, who, notwithstanding the fact that he had money to the credit of the Morrison-Madison Company, Limited, refused to furnish the company money to pay off the grinding expenses. By what right could Henderson have given any such refusal unless it was that he had the right to retain out of the proceeds a sufficient amount to cover his $15,000 note? And the fact that the company did not resent this refusal impresses me as an admission that there was an obligation on their part to ship this crop to Henderson in order that he might retain out of the proceeds the amount called for by the note in this suit.
“Henderson swears positively that at the time he had about $8,500 belonging to the Morrison-Madison Company, Limited, and that he positively refused to allow them to draw the same unless he was paid his note of $15,000. It was then, on the 17th of December, 1900, that Morrison and Madison went to Henderson’s office, handed him a cheek of $15,000 on the Canal Bank, by Mrs. *486 Shaffer, 'and received from Mm the note in controversy. All the witnesses agree that at the interview where the check and note ■changed hands nothing was said as to whether the note was being paid or purchased. Madison swears that Henderson had agreed to part with the note; that, being a good investment, he advised Mrs. Shaffer, as her attorney, to buy it; and that she had given him her check for that purpose; and that Henderson parted with the note and delivered it to him as agent and attorney of Mrs. ¡Shaffer, and not as secretary and treasurer of the Morrison-Madison Company, Limited.
“The main and only issue in this case is whether the delivery of the $15,000 check to Henderson and the delivery of the $15,000 note to Morrison was a payment or a sale of the note. When this exchange of check and note was made, there were present Morrison, president of the company, Madison, secretary-treasurer, and Henderson, the plaintiff. Nothing was said at that time to indicate the intention of the participants to this transaction, and the only means of ascertaining what really took place is to look into and carefully weigh all the surrounding facts and circumstances preceding the transaction and the situation of the parties at the time. It is shown that when the plantation was sold in August, 1900, there was upon it a large ■crop of sugar cane already grown and cultivated, requiring very little further outlay of money except for harvesting; that the first note of $15,000 was to be paid by the purchasers out of that crop, it being their only means of meeting the payment of the same; that, although both Morrison and Madison swear that the crop was consigned to Henderson as a matter of courtesy, they accepted his refusal to give them any more money "about December 15th, as though Henderson had a right to retain the funds then in his hands for account of the company to meet the payment of his first due note of $15,000, and that he only consented to give them more money after he had received the $15,000 ■check from Mrs. Shaffer. If Henderson had consented to sell this note, as understood by Madison, would he in any way have bettered his situation? Surely not; He would thereby have diminished the security for the rest of his notes, and it is impossible to conceive that an experienced man of business, situated as he was, could have believed that by selling his first due note he was in any manner improving his chances of collecting all of the purchase price due him by the Morrison-Madison' Company, Limited. It is clear to me that Henderson never had any intention of selling this note, and the conversation referred to by Madison, whenever Henderson complained that he had too much to carry, was not, as interpreted by Madison, that Henderson was short of funds, but because Henderson saw the security for his claim — the crop and its proceeds — gradually disappearing, and consequent risk of losing part of the money which the' company had obligated to pay to him. It being, then, established that Henderson did not intend to sell, that he never gave his consent to any sale or transfer, was he guilty of such laches as to be equitably estopped from contesting the rights of Mrs. Shaffer? If Mrs. Shaffer is an innocent third person, herself free from any laches, the doctrine of equitable estoppel may be invoked; but the record in this case does not, in my opinion, convey any such impression.
“When the Morrison-Madison Company, Limited, was organized, the defendant not only subscribed to its stock, but advanced all the money which the other two stockholders had subscribed, Madison says, to the company,' but Morrison says, to them, on their individual note, which she discounted. She became a director in the company; and, while I believe that in reality she may not have been cognizant of all the details of the business transacted between the company and Henderson, did she not in fact allow the use of her name and of her purse to her fellow stockholders in such a manner as to enable them to place Henderson in the position in which he finds himself to-day? Did she not repose unlimited confidence in Morrison-Madison, and sanction all their acts, and is she not fully struck with notice of the same? As a director .in the company, and as a mandator of Madison, she is, in my opinion, bound by every act of Morrison-Madison, and fully bound by their' knowledge. Every act- of Madison and Morrison was as much for her benefit as for their own. There was no conflict of interest between them. Every benefit the latter could obtain for the company inured to her as much as it did to them. *488 There wás no question of fraud involved, in this suit, but the defendant contends that she is an innocent third person, acting in good faith; and these facts are certainly pertinent'to that issue. Neither is there any question here as to the right of the stockholder to advance in good faith money to a corporation, just as any third person could do, and to acquire obligations of that corporation. Mrs. Shaffer knew that Morrison and Madison were respectively president, secretary and treasurer, of the company; that when they went to Henderson with her check that Henderson only knew them as such, and not as her personal agents; and that, if they had intended to take up the $15,000 note as her agents, it was their duty to have disclosed the new capacity in which they were acting to Henderson, and there was no duty upon Henderson to divine that fact simply because she had signed the check. Again, did not Mrs. Shaffer accept the check of the Morrison-Madison Company, Limited, in payment of her claim against Madison and Morrison individually, when she knew the company had declared no dividends, and that the latter were paying her with corporate funds?
“The conclusion to be drawn from all the evidence in the case seems to me to be irresistible, without impugning the motives of any of the actors in this transaction, that Henderson had a large claim against the Morrison-Madison Company, Limited, which was well^ secured with the crop on the plantation; that without the crop the plantation was not of itself valuable enough to satisfy the whole amount of his claim; that, after the greater portion of the crop had been harvested and sold, his claim being in no manner diminished, he became apprehensive, and insisted on the payment of his first due note, before turning over any more money to the company.
“That his fears had been aggravated by the fact that he had previously turned over to the company $20,000, which were used to pay the individual debt of two of the directors to the other one, instead of being used to pay the debts of the corporation. That all these facts should have been known to the defendant, and she was legally bound to know the same; and that when the president and secretary and treasurer took up, at his (Henderson’s) request, the first due note, without disclosing the fact that they were acting as agents of defendant, he had a right to believe that the note was being paid by the corporation; and that all the equities are with the plaintiff.
“The evidence in this case does not support the defendant’s plea of error" in fact and in law any more than it supports her defense of good faith as an innocent third person; and, if she did act under such error, her remedy is not against the plaintiff, who-is unquestionably free from any wrongdoing, and, in my opinion, not chargeable with any laches, and in no manner responsible for the errors of defendant.
“The other ground for injunction I believe to be equally well taken. Executory process-under one note forming part of a series of notes, the others of which are not due, should' order the sale of the property on such terms of credit as are granted to the debtor by the general contract for the payment of such installments as are not yet due.
“For the foregoing reasons, and by further reason of the law and the evidence being in-favor of plaintiff and against defendant, it is ordered, adjudged, and decreed that the note of $15,000 of the Morrison-Madison Company, Limited, dated August 2, 1900, be-declared to have been paid, and the mortgage securing the same on the Delogny plantation in this parish be' declared extinguished pro tanto, and the executory proceedings thereon by Mrs. A. C. Shaffer null and .void, and that the writ of injunction-herein issued be maintained and perpetuated, and that the defendant pay all costs of these-proceedings.”
Opinion.
We have carefully examined the record in-connection with this judgment, and we do not see how, under the evidence, a conclusion other than that arrived at by the judge-of that court could have been reached.
It cannot plausibly be maintained, so fajas Henderson was concerned, that there was-any intention to sell the note to the defendant. There was no motive impelling him to-do so; on the contrary, there was every reason why he should not. All the circumstances connected with the transaction disclose the fact that in accepting Mrs. Shaffer’s- *490 ■check and delivering the $15,000 note of the' company to its secretary and treasurer, he believed, and had just reason to believe, that the note was being paid through the check. If Mrs. Shaffer’s intention was to purchase the note, and not to pay it, she acted very incautiously in selecting as her agent for making the purchase the secretary and treasurer of the company, the very party with' whom Henderson would naturally expect to ■deal in receiving payment. If there was any error in the premises, this act on her part contributed — in fact, led up — directly to the commission of the error, and to misleading Henderson. There would have been no absolute legal inconsistency in Mrs. Shaffer’s selecting as her agent for buying the note from the plaintiff the secretary and treasurer of the debtor company; but knowing, as she did, the position which this agent bore to the company, and the natural inference which Henderson would draw, in any dealings he might have with him, that he was dealing with him as representing the company itself, it was her duty to have communicated to him in some positive way that in the matter of her check he would not be acting so, but for and on her individual behalf. Nothing less than notice of that fact brought home to him by clear evidence would warrant her in charging him with either imprudence or fault. Morrison, the president •of the company (who attended Madison when the check was received and note surrendered), was Mrs. Shaffer’s adopted son, and a member of the family. Madison, the secretary and treasurer of the corporation, had married the niece of her husband, and there seems to have been great friendship and intimacy between them. Her friendship for the young men was evidenced by the fact that she advanced $9,900 to one and $10,000 to the other in order to enable them to furnish the capital of the corporation which they were about to organize, and consented to become and did become the holder of one share of the stock of the company, and one ■of its three directors.
The Bessie K. plantation was bought on the-day of July, 1900, by the corporation from the plaintiff by a notarial act, both vendor and vendee represented in the act by parties acting under powers of attorney. The corporation was represented by Mr. Madison, secretary and treasurer. The power of attorney to him was embodied in a resolution of the corporation, which recited the fact that Henderson had offered to sell the plantation, and authorized its agent to purchase the property for $100,000, in the manner declared therein — $20,000 cash, $15,000 on the 1st of January, 1901, payable out of the first sugar, the balance of the price to be represented by promissory notes maturing at different dates, secured by special mortgage and vendor’s privilege on the property.
A copy of this resolution was annexed to the act of sale, and is in evidence in the record. When the act of sale was executed, the terms of the sale were fixed as mentioned in this power, with this variance: that the $15,000 to which reference was made in the resolution simply as $15,000 payable out' of the first sugar was made to be represented by a promissory note, and made to be secured by a special mortgage and vendor’s privilege.
Neither party complained of this variance. The crop of the year 1900, as harvested and manufactured, was as a fact shipped for sale to Henderson, who was in the sugar business in New Orleans. When a large amount of the proceeds of the crop were in his hands, but before the maturity of the $15,000 note, Henderson turned over to the company $20,-000 of its funds, to be applied to the payment of debts of the corporation, which it was represented to him should be met. Later on he was applied to, first, for $9,000 (reduced afterwards to $8,500), but he refused the application, though he had at that time in hi's hands $8,500 of the proceeds of the crop. He testified that he told Mr. Madison that the $20,000 he had turned over to him had not been used for the purpose it was gotten for; that he refused to pay any more of the money in his hands until the $15,000 note was paid; that Mr. Madison attempted to show that, even if he parted with $8,500, there was sufficient sugar on the way and on the plantation to protect the $15,000; that he had parted with money he should not have parted with, and he refused to part with any more until this $15,000 were paid; he thought it was time to look out for himself; that Mr. Madison told him that, even if the sugar was not sufficient to pay the $15,-000, Mrs. Shaffer would see that the note *492 was taken care of; that he replied that, if Mrs. Shaffer was willing to risk the amount of the note, why not get the $8,500 from her, and leave the money in his hands until the balance came in to pay the $15,000; that he answered, “No, I won’t do that; we know our rights;” that later Mr. Madison, accompanied by Mr. Morrison, called at his office, and the former said to him, “If we give you Mrs. Shaffer’s check for the $15,000, will you give us the $8,500?” that he replied, “Certainly; that all he wanted was the $15,000;” that he then presented him Mrs. Shaffer’s check, and he immediately wrote out a check for $8,500, and handed it to Mr. Madison; that no statement was made about buying the note; that the $8,500 in his hands were the proceeds of the crop, and, in addition to that amount, there were received later about $13,000 additional; that, after receiving the $15,000, he relinquished all claims except his commission on the balance of the proceeds; that he made no subrogation to the note, and had no intention of selling it. Why should he have had such intention, as he had the money in his hands practically (or had a portion of it), and knew what sugar there was to come?
It is not pretended that Mrs. Shaffer ever had any communication with Henderson other than through Madison, and then only in so far as the possession by the latter of her check in his hands and his delivery to I-Ienderson might be claimed to have brought her into communication with him.
We are of the opinion that when Mrs. Shaffer made "out her check payable to the order of the plaintiff, and placed it in the hands of Madison, the secretary and treasurer of' the company, she thereby intrusted him with the right of delivering the same to Henderson to whose order it was made. If there were any secret instructions or limitations as to how, or when, or under what circumstances this was to be done, they were not made known. The effect of Mrs. Shaffer’s check, so made, and placed in the possession and under the control of the secretary and treasurer, was practically as if she had placed the same amount of money belonging to her in his hands. The check was had recourse to simply as a convenient instrumentality by means of -which the money could be received by Henderson, and when the check was cashed matters were in precisely the same position as if Madison himself had paid the plaintiff directly the amount which the check called for. Stauffer, McReady & Co. v. Morgan, 39 La. Ann. 634, 2 South. 98; Aiken v. Robinson, 52 La. Ann. 931, 932, 27 South. 529.
■Appellant places the case before us as one involving equities in her favor, but we do-not view matters in that light. The corporation’s funds, which to the amount of $20,000 had been turned over to Madison for the payment of “corporation” indebtedness, were not so applied; on the contrary, they were-diverted from their proper application, and used to pay the individual indebtedness of Madison and Morrison, two of the stockholders, to the defendant, the third stockholder, who was herself a • director of the comphny.
The amount received by her was placed toller credit in the Canal Bank, and the cheek which she subsequently drew for $15,000 in favor of plaintiff was drawn against that particular fund, so that in reality the payment was effected through funds of the corporation, though they had been withdrawn-from Henderson’s hands, and stood on the-books of the bank in the name of Mrs. Shaffer.
We need not inquire whether it would not have been in Henderson’s power, had the situation required it, to have attacked the payment so made to Mrs. Shaffer, and forced the application of the $20,000 which she had so received to the payment of the corporation indebtedness to him, for matters, as they shaped themselves, brought about the identical condition of affairs which the situation legally and equitably called for.
That Henderson was in absolute good faith-in this matter, and that he was firmly convinced that the payment to him of the check operated the absolute extinguishment of the-indebtedness represented by the note, is evidenced by the fact that he permitted the $8,500 of corporation funds then in his hands and the $13,000 which he received later to-be drawn out by the officers of the corporation.
Appellant urges that, should -the court hold that she did not succeed, through her check, in “buying” the $15,000 note, -and that Henderson did not “sell it,” then, her “inten *494 tion” being to “buy,” the minds of the parties did not meet; there was no “aggregatio mentium”; and the payment of the check was a payment in error, and therefore she is entitled to recover back the amount so paid.
The payment made was by the secretary and treasurer of a company justly owing the debt to the party to whom it was owing through the instrumentality of a check drawn by defendant, a stockholder and director in the company, placed in the hands of that officer under such circumstances as to justify the creditor in receiving and treating it as so much cash. On the faith of the delivery of that check to him, he surrendered and parted with the note which he held, and relinquished his hold upon the corporation funds which he then held and those which he subsequently received. Under such circumstances there is no right to a restitution. Oiv. Code, art. 2310.
“If by an error or ignorance of the law one has done himself a prejudice which cannot be repaired without breaking in upon the right of another, the error shall not be corrected to the prejudice of the latter.” Kenner v. Godchaux Co., 52 La. Ann. 967, 27 South. 542.
We find no error in the judgment appealed from, and it is hereby affirmed.